# CHESAPEAKE AND OHIO RAILWAY COMPANY *v.* HOWARD.

## ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 247.   Argued April 17, 18, 1900.—Decided May 21, 1900.

The wife of the defendant in error, while travelling from Louisville to Washington on a through ticket, in a car of the plaintiff in error, and on a train conducted by his agents, was run off the track and down a bank in consequence of the weakness of a wheel which might have been known, and suffered a serious and lasting injury, for which an action was brought to recover compensation. The defence set up that at the time the accident happened the train was managed by a Connecticut company to whom the road had been leased. *Held,* that that fact would not bar a recovery; that if notwithstanding the execution of the lease the plaintiff in error, through its agents and servants, managed and conducted and controlled the train to which the accident happened, it would be responsible for that accident.

THE railroad company seeks by this writ of error to reverse a judgment obtained against it at a trial term of the Supreme Court of the District of Columbia in favor of defendants in error, which judgment has been affirmed by the Court of Appeals of the District.

The defendants in error are husband and wife, and the action was brought by them to recover damages alleged to have been sustained by the wife because the car in which she was riding ran off the track while forming part of a train in transit from Louisville, Kentucky, to the city of Washington, D. C. The accident occurred during the night of November 16, 1886, at a place called Soldier, in the State of Kentucky, and about 60 miles west of the east line of the State, and while the train was running on the rails of the Elizabethtown, Lexington and Big Sandy Railroad Company, which was a Kentucky corporation.

The amended declaration of the plaintiffs below alleged that the train on which the wife was a passenger was operated and conducted by the agents of the plaintiff in error, and that the plaintiff in error was managing and operating a line of railway

between the cities of Louisville, in the State of Kentucky, and Washington city, in the District of Columbia, and upon said line of railway it was a common carrier of passengers for hire ; that on the 18th of November, 1886, the plaintiff, Laura P. Howard, purchased from the agents of the defendant, at the city of Louisville, a ticket entitling her to a passage upon the railway from the city of Louisville to the city of Washington, and the defendant, it was alleged, thereupon became bound to safely carry and transport her from the city of Louisville to the city of Washington, but the defendant did not carry or transport her safely, and that near the town of Soldier, in the State of Kentucky, by the unskillfulness, carelessness and wrongful neglect and mismanagement of defendants' agents in charge of said train, the sleeping car in which she was riding left the track, and went down an embankment and was demolished, and she was badly wounded and injured, and that by reason of these injuries she suffered great pain, and has been rendered permanently unable to do any business.

The defendant took issue upon these allegations, and the case went to trial. It has been twice tried, and upon the first trial, when all the evidence was in, the court directed a verdict for the defendant on the ground that no liability on its part had been shown for the accident in question. Upon appeal to the Court of Appeals of the District that court reversed the judgment, 11 App. D. C. 300, and granted a new trial. A retrial was had, and the jury found a verdict in favor of the plaintiff, upon which judgment was entered, and on appeal it has been affirmed by the Court of Appeals. 14 App. D. C. 262.

*Mr. Leigh Robinson* for plaintiff in error.

*Mr. R. Ross Perry* for defendants in error. *Mr. James Francis Smith* and *Mr. R. Ross Perry, Jr.*, were with him on the brief.

Mr. Justice Peckham, after stating the above facts, delivered the opinion of the court.

The injuries sustained by Mrs. Howard, as shown by the evi-

dence, are very serious, and undoubtedly permanent. The accident happened at night, the car in which she was sleeping left the rail and went over an embankment about-thirty feet high, and was broken to pieces. She was released from the car and taken to a cottage by the wayside, and subsequently was given a berth in a sleeping car and brought to Washington.

On the trial she was sworn as a witness, and testified that the disease was evidently progressing, because she could not sit up as long; that she could not walk any distance; could not ride in the street cars without great suffering; that she suffered in various ways a great deal, in her head and in her spine, and was never free from pain. The suffering in her head was at the base of the brain, and if she wanted to see anything back of her she had to turn her entire body; she could not turn her head either way. She said she had been under the doctor's care most of the time during the past eleven years up to the time of the trial.

Dr. Chrystie, a specialist in spinal diseases, testified on the trial that Mrs. Howard placed herself under his treatment early in 1887, and had been under his treatment ever since. He said that she was suffering from an incurable spinal affection, which was progressive, occasioning great suffering and almost total disability. The witness had contrived and made for her an apparatus grasping the hip and extending up to the shoulders and giving support in front, which steadies the back as a broken bone would be steadied, and this gives her partial relief, but the disease is located so low down, so much superincumbence of weight above, that it does not give her complete relief. The apparatus is made of steel, and the doctor said should be worn constantly, and she should sleep in it at night. It is necessary for her to wear it every hour for comfort, as well as for the protection of her backbone. The disease is progressing slowly, and, if it had not been for this spinal assistance, he thought she would have had complete paralysis.

At the time of the accident she was a clerk in the Agricultural Department at Washington, but since that time has been compelled to give up her position, and has been unable to do any work.

The probable cause of the accident, as shown by the evidence given by the plaintiffs, was an imperfect flange on one of the wheels of the sleeping car in which Mrs. Howard was riding. It did not appear that a careful inspection could not have discovered the defect. There was evidence also given as to the train being driven at a reckless rate of speed at the time. We think there was sufficient evidence of negligence to carry the case to the jury.

The most important question, that of the liability of the defendant company for the consequences of an accident on the road of another company, arises upon the evidence now to be considered.

In order to sustain their claim the plaintiffs gave evidence showing the following facts: The Elizabethtown, Lexington and Big Sandy Railroad Company, hereinafter called the Kentucky company, was incorporated by an act of the legislature of Kentucky, approved January 29, 1869, for the purpose of building a railroad from Elizabethtown to a point on the Big Sandy River at or within 20 miles of its mouth, all within the State of Kentucky. By a subsequent act the company was authorized to sell the railroad or lease the same whenever it might be to the interest of the company to do so. The Big Sandy River is the boundary line between the States of West Virginia and Kentucky.

At this time the Chesapeake and Ohio Railway Company, the plaintiff in error, (hereinafter called the Virginia company,) or its predecessor, had been incorporated by an act of the legislature of Virginia, and was operating its railroad from Phœbus, a station about a mile east of Fortress Monroe, in Virginia, to Huntington, in the State of West Virginia, and about eight miles east of the Big Sandy River.

In 1877 the legislature of West Virginia passed an act providing for a terminus for the Chesapeake and Ohio Railway on that river, and for the building of a bridge over it so as to connect with the road of the Kentucky corporation. That corporation had not then built its road east of Mount Sterling, a place some distance west of the river, and on November 12, 1879, the Virginia and Kentucky corporations entered into an

agreement, by which the Kentucky corporation was to complete its railroad from Mount Sterling east to the river, and thereby form a connection with the road of the Virginia company, and in consideration thereof the latter company was to complete its road from the station at Huntington to and across the river, and allow the Kentucky corporation the free and undisputed use of its railroad from the westerly bank, and across the river to the depot of the Virginia corporation in the city of Huntington, for the term of five years from the date of the completion of the road as stated.

Pursuant to the agreement this extension from Huntington west to the river was completed early in 1882, and at that time the Kentucky corporation had also completed its road from Mount Sterling east to the river, and had also a running arrangement over the Louisville and Nashville Railroad into the city of Louisville.

During these times Mr. C. P. Huntington was very largely interested and was the controlling spirit in a number of railroads situated both east and west of the Mississippi. He had built many new lines and extended many old ones, and had a plan for bringing into practically one management a line of railroad extending from the Atlantic to the Pacific. He was also desirous of organizing into one line his lines east of the Mississippi River, consisting of the Virginia company, the Kentucky company and the Chesapeake and Ohio and Southwestern Railroad Company.

After the completion of the road of the Virginia company from Huntington to the west side of the river and its connection with the Kentucky corporation at that point, an arrangement was made between the two corporations by which they were operated substantially as a continuous system. They were operated together by one general manager, under verbal directions from Mr. Huntington, who was president of the Virginia company, and owned a controlling amount of the stock of the Kentucky company. Under that arrangement the Virginia company "operated and maintained the line of railroad for and on account of the Elizabethtown, Lexington and Big Sandy Railroad Company, mostly west of the Big Sandy River,

to Lexington, and included in that also the eight miles of track between the west bank of the river and Huntington. They operated it for and on account of the Elizabethtown, Lexington and Big Sandy Railroad Company, keeping an account on the books of the Chesapeake and Ohio Railway Company of all receipts of every character between Lexington and Huntington, including also the Louisville connection." This was in the early part of 1882. The arrangement continued, as testified to by one of the witnesses, who was an officer of the defendant, until the organization of the Newport News and Mississippi Valley Railroad Company, (hereinafter spoken of,) after which it is said that its officers operated the properties under the leases hereinafter mentioned. (This statement appears to be merely the conclusion of the witness from the other facts in the case.) The duration of the contract or arrangement under which the Virginia and Kentucky roads were operated as a continuous system was to be five years from the date of the completion of the road, which was in the early part of 1882, and that would have made the arrangement continue until 1887, a period subsequent to the happening of the accident. The witness supposed that the organization of the Newport News and Mississippi Valley Railroad Company terminated the contract by force of the lease above referred to. He stated that it was terminated in the same manner in which it was made, by the direction of Mr. Huntington; that Mr. Huntington directed Mr. Smith, the general manager, to operate the properties in accordance with the leases after they had been made. Mr. Huntington desired to extend, complete and bring his different railroads under one management, that of himself.

For the purpose of being able the more easily to accomplish this object, Mr. Huntington procured from the legislature of the State of Connecticut an act, approved March 27, 1884, incorporating the Southern Pacific Railroad Company, which was therein authorized and empowered to contract for and acquire, by purchase or otherwise, and buy, hold, own, lease, etc., railroads, railroad bridges, engines, cars, rolling stock and other railway equipment, etc., in any state or territory; "Provided, however, that said corporation shall not have power to

make joint stock with, lease, hold, own or operate any railroad within the State of Connecticut."

On March 19, 1885, the legislature of Connecticut changed the name of the Southern Pacific Company to that of the Newport News and Mississippi Valley Company, with all the powers and privileges and subject to all the liabilities existing under the former name.

On January 29, 1886, the Kentucky corporation and the Newport News and Mississippi Valley Company, (the Connecticut corporation,) entered into an agreement of lease, by which the Kentucky corporation leased its road to the Connecticut corporation for 250 years from the first day of February, 1886, at a rental of $5000 per annum, and on June 15, 1886, the Virginia corporation and the Connecticut corporation also entered into an agreement, by which the railroad of the former was leased to the latter corporation from July 1, 1886, for 250 years, at a yearly rental of $5000.

As Mrs. Howard's injuries were sustained in November, 1886, on the railroad in Kentucky which had been leased to the Connecticut corporation the January previous, the plaintiff in error herein makes the claim that it is not liable for the results of that accident, because it did not occur on its road nor on the road of any company for the negligent acts of whose agents it was responsible.

Assuming that the Kentucky railroad had been leased to the Connecticut corporation, and that the latter was, at the time the accident occurred, actually engaged in the management of the former, and that the train to which the accident happened was conducted and managed by the agents of the Connecticut company, it might then be assumed that this plaintiff in error could not be held responsible for the result of such accident; but the simple fact that at the time when it occurred the lease spoken of was in existence would not conclusively bar a recovery in this case. If, notwithstanding the execution of the lease, the plaintiff in error in fact, through its agents and servants, managed and conducted and controlled the train to which the accident happened, it would be responsible for that accident, notwithstanding the existence of the lease. The evidence was

sufficient to show that prior to the execution of the lease the Kentucky corporation was controlled and managed by the plaintiff in error, and it was so controlled and managed by the direction of Mr. Huntington, the president of plaintiff in error. It is claimed that this arrangement was wholly illegal, as beyond the powers of the Virginia corporation. But if, while the Kentucky corporation was managed under such agreement, an accident had occurred by reason of the negligence of the agents and servants of the Virginia company, it would have been liable for the damages arising therefrom, notwithstanding the agreement or arrangement under which such control was maintained was illegal. If the agents and servants of a corporation commit a wrong in the course of their employment and while in the performance of an agreement of the corporation which is *ultra vires*, the company is liable for the wrong thus committed, notwithstanding the illegality of the agreement. *National Bank* v. *Graham*, 100 U. S. 699, 702; *Salt Lake City* v. *Hollister*, 118 id. 256, 260; *Bissell* v. *Railroad Company*, 22 N. Y. 258; *Buffett* v. *Railroad Company*, 40 id. 168; *Nims* v. *Mount Hermon Boys' School*, 160 Mass. 177; *Railroad Company* v. *Haring*, 47 N. J. L. 137.

We are, therefore, brought to a consideration of the evidence in the record, tending to show that this train was a train of the plaintiff in error, controlled and managed by its agents and servants, for whose negligence it is liable.

The circumstances attending and leading up to the arrangement made between the Virginia and Kentucky companies in 1882, by which arrangement the former took upon itself the management of the Kentucky company, have been set forth somewhat in detail in order that such facts might be viewed in connection with the evidence as to the leases and the manner in which the affairs of the roads were thereafter conducted, so that the whole case could be examined to determine whether it was proper to submit to the jury the main question of fact: Who had the management and control of the train to which the accident happened?

Evidence was given that many years prior to the execution of the lease above referred to the Virginia company had estab-

lished offices and an agency in the city of Washington for the purpose of obtaining business for that company and its connections, and it had entered into some kind of running arrangements with the Virginia Midland Railway Company, whose road extended from the city of Washington through the city of Charlottesville, in the State of Virginia, a station on the line of the Chesapeake and Ohio Company. After the arrangement between the Virginia and Kentucky companies above mentioned, if not before, the Virginia company sold tickets at Washington through to Louisville, and *vice versa*, and advertised the route in various newspapers throughout the country, especially in Washington and Louisville, in which the route was designated as the Chesapeake and Ohio Railroad, or Route, and it also advertised that it ran through or " solid " trains over this route. Such advertisements were continued after the execution of the lease up to and after the happening of this accident. There is room in the evidence for the inference, which a jury might draw, that the Chesapeake and Ohio Company, by these various facts, and by such advertisements, and by the tickets which it sold, held itself out to the public as a carrier of passengers between the two cities. There was no substantial change in the character either of the advertisements or of the tickets after the execution of the leases.

If the Virginia company did in fact thus hold itself out as a carrier of passengers between the two cities without change of cars and by a solid train, the inference that such train was its own, and that the servants in charge thereof were its servants, might be based upon that fact together with the other evidence in the case, and such inference would be for the jury.

For the sole purpose of organization, and the more readily to enable Mr. Huntington to work out his scheme for one continuous line from the Atlantic to the Pacific, he procured the acts of the Connecticut legislature incorporating the Newport News and Mississippi Valley Railroad Company. The capital stock of the corporation was fixed at a million dollars, divided into shares of one hundred dollars each, and the act provided that whenever five hundred thousand dollars should be subscribed and ten per centum of the subscription paid in cash, the stockholders

might organize the corporation, which might then proceed to do the business authorized by the act. An affidavit of the secretary of the company attached to the copy of the articles of association, filed in the office of the secretary of State of West Virginia, showed the acceptance of this charter by the vote of a majority of the corporation and the subscription of five hundred thousand dollars to the capital stock on May 10, 1884, and the payment in cash of ten per centum at the time of such subscriptions. There was no proof of a dollar's worth of the capital stock ever having been issued, although officers of the company seem to have been elected. Mr. Huntington was the president of the corporation, and the officers of the Virginia corporation appear to have been also elected or to have acted as officers of the Connecticut corporation. After the execution of the leases already mentioned there seems to have been no actual change in the *personnel* of the officers of the leased road, nor in the actual management or control thereof. The same hands continued apparently in the same employment. There is no proof of the payment of a single dollar on account of these leases, but nevertheless a formal transfer was alleged to have been made to the lessee of the rolling stock and equipment of the Virginia and Kentucky corporations. The evidence is sufficient to admit the inference that it was a merely formal although possibly valid lease for the purpose of organization, which would render it easier to accomplish the formation of a continuous line, which Mr. Huntington had at heart. The same offices in the city of Washington were retained after the lease as before. The same individuals remained in the same relative positions therein, and substantially the same advertisements and the same kind of tickets were inserted in the newspapers and sold at the offices after as before the execution of the leases. The sign at the Washington office was " Chesapeake & Ohio Railway Ticket Office," at the windows where the tickets were sold and over the doors, and no change was made after the execution of the leases, and after that time, as well as prior thereto, they continued to use the name of the Chesapeake and Ohio Railway and Chesapeake and Ohio Route, and the general passenger agent said that from the time he commenced in 1882 he

did not think the sign was ever changed.   He was under the impression that the tickets had been changed after the execution of the leases, and that they were then issued in the name of the Newport News and Mississippi Valley Company, but that was a mere impression.   The ticket of the plaintiff was issued by the Virginia company, and provided for a passage from Louisville to Washington.   She had taken this route to and from Washington several times before, and her ticket, of the same description, had always been honored over the whole length of road between the two cities.

From all these facts it does not necessarily follow as a legal conclusion that the execution of a lease from the Kentucky to the Connecticut corporation changed the status of the former company, and effected in and of itself a change in the operation and management of that company, so that the Virginia company no longer managed or controlled the Kentucky company.   The lease might exist, and the Virginia company might still manage the Kentucky company or some particular through train over that road.

Evidence was also given showing that some time after the execution of these leases, and after the happening of the accident, the Virginia company went into the hands of a receiver at the instance of Mr. Huntington, and after it came out the Connecticut corporation went out of existence, and transferred all the property which had come to it from the Virginia company back to that corporation, and during all that period there was actually no change in the manner of conducting the business of the roads other than as a matter of bookkeeping, nor in the persons who filled the offices and did the work of the companies.   The Connecticut corporation simply disappeared from view.   During the whole period it was the Chesapeake and Ohio Route or the Chesapeake and Ohio Road that was advertised as forming a continuous line from Washington to Louisville and carrying passengers thereon without change of cars and in a solid train.

Coming to the particular case of the defendants in error, the evidence showed that the wife purchased the ticket upon which she entered the car at Louisville; that it was a ticket headed

"Chesapeake & Ohio Railway," and that it stated that it was good for one continuous, first-class passage from Louisville, Kentucky, to Washington, D. C., and was signed by the same person who had theretofore been the general passenger and ticket agent of the Chesapeake and Ohio Railway. The ticket contained a notice that the company acted only as agent in selling for passage over other roads; but we think it plain that a passage over a road or on a train which was controlled or managed by it would not be included in such exception. .The ticket was not purchased at the regular ticket office of the company, but from what is termed in the evidence a "scalper," and was the half of a round trip or excursion ticket from Washington to Louisville and return. When Mrs. Howard came to the station at Louisville for the purpose of commencing her journey she entered the train which was lettered or had a card attached to it signifying that it was the Chesapeake and Ohio train for Washington, and she supposed she was on a train of that company, and after entering the sleeping car she surrendered her ticket to the conductor, and the same was received as a good and sufficient ticket entitling her to transportation from Louisville to Washington. After the accident happened, and while she was on her way to Washington in the train which had been procured for the passengers, she was attended by a doctor, who stated that he was the chief of the corps of surgeons of the Chesapeake and Ohio Railway, and when she told the doctor she was afraid she would lose her position on account of the injury, she testified that the doctor said to her, "The company will see you through," and although he did not say the Chesapeake and Ohio Railway Company, yet from the conversation she had with him she understood that it was that company for which he spoke.

Other evidence was given on this subject which it is not necessary to refer to, and when the judge came to charge the jury he stated upon this point as follows:

"It is not enough, to render the defendant liable or to justify you in finding that it was operating the road, to find that it sold tickets over it. If the defendant simply sold a through ticket from Louisville to Washington, or sold a round-trip ticket from

Washington to Louisville and return to Washington, and the plaintiff, Mrs. Howard, had the return part of that ticket, that alone would not be sufficient evidence to establish the fact that the Chesapeake and Ohio Railroad Company was operating this Elizabethtown, Lexington and Big Sandy road. We all know that railroad companies habitually sell tickets over their own roads and, in connection with them, over other roads, so that the mere sale of such a ticket, and that in itself would not be sufficient. It must appear from all the evidence to your satisfaction, not only that this defendant sold a ticket over that road, upon the faith of which this lady was riding at the time, but in order to hold the defendant liable you should find that the Chesapeake and Ohio Railroad Company, as a corporation, by its officers and agents, was operating this road; that. that corporation, the Chesapeake and Ohio Railroad Company, controlled this road, operated it, ran it, and that the trains which ran over it were the trains of the Chesapeake and Ohio Railroad Company; that they were manned by their employés and controlled by their officers and agents; and, unless you find that the evidence establishes that state of facts, you would find for the defendant upon that point, because, in order to render the defendant liable for this accident, if it was caused by negligence, it must appear to your satisfaction by a preponderance of evidence that the Chesapeake and Ohio Railroad Company controlled and were running its trains over this road.

"Perhaps I may aid you a little further upon that question without touching upon your province, for the fact is all for you. There is evidence here tending to show that state of facts. The plaintiffs claim that the evidence is sufficient to establish it; that is, the Chesapeake and Ohio Railroad Company controlled this particular road, and was running trains over it at the time of this accident. The defendant denies that the evidence is sufficient to establish those facts, and it is for you to determine which one of them is right in relation to it. The defendant also says that even if the evidence is sufficient to establish that state of facts at any time, that state of facts did not exist at the time of this accident; that it was ended in January, 1886, some months prior to this accident, by the lease which the Elizabeth-

town, Lexington and Big Sandy Railroad Company made to the Newport News and Mississippi Valley Railroad Company. That lease is in evidence. I suggest that you divide that subject into two heads. First, determine whether the evidence is sufficient, when you take it all together, to establish to your satisfaction the fact that the defendant here, the Chesapeake and Ohio Railroad Company, was controlling and running the Elizabethtown, Lexington and Big Sandy road prior to the execution of this lease to which I have just referred. If you find the evidence insufficient to establish that, you might dismiss that subject, I should say, without looking any further, and find for the defendant. But if you find from the evidence that the Chesapeake and Ohio Railroad Company, immediately before the execution of this lease just mentioned, was operating and controlling this Elizabethtown road, then you would naturally pass to the next step, which is, whether the execution of this lease and the facts and circumstances attendant upon it ended that arrangement, so that the Chesapeake and Ohio Railroad Company ceased at the time of the execution of that lease to control and run the trains upon that road."

We think this charge was in substance correct, although we do not suppose it was necessary, in order to hold the Virginia company liable, that it should have had the complete control and management of the road of the Kentucky corporation. If it had the control and management of that train it would have been sufficient, even though the Kentucky or the Connecticut company managed and controlled other and local trains over the road of the Kentucky company.

The point would be whether there was evidence enough to submit the question to the jury as to the management and control of the train by the plaintiff in error. Upon a careful consideration of the whole case and all the various circumstances prior to and connected with the making of these leases, we think there was evidence sufficient to allow the jury to pass upon that question as one of fact, and the decision of the jury in favor of the plaintiff ought not to be disturbed.

The circumstances of the case are quite unusual. The evidence shows that in each of the three corporations there was

but one controlling and guiding hand; that all the steps taken were steps in the direction of establishing, organizing and maintaining a continuous line of road from one ocean to the other, and that the various contracts, arrangements and leases were but means to accomplish this one purpose; that the Virginia company, under the guidance and direction of Mr. Huntington, held itself out to the world as a carrier or transporter and not a mere forwarder of passengers from Washington to Louisville or the reverse, and that it issued tickets as evidence or tokens of its contract to so carry. The mere formal existence of these leases does not change the actual facts in the case. Assuming their validity, they are not conclusive against the defendants in error. They could exist, and the train in question in this case might still have been under the general control of or managed by the Virginia corporation. If so, it was responsible for the neglect of the agents employed by it. The fact that the Kentucky road had immediately prior to the lease been in the actual control and management of the Virginia company, when taken in connection with the other evidence in the case, is an important one in determining the main question as to the continuation of such management of the road or of the train after the execution of the lease to the Connecticut corporation. In our judgment a submission of the question as one of fact for the jury was not error.

Another question was argued relating to the alleged release of the cause of action by Mrs. Howard upon the payment of two hundred dollars. The evidence adduced by the plaintiffs in regard to the release was sufficient, if believed, to render it unavailable as a defence. The question was submitted to the jury under instructions quite as favorable to the defendant as it was entitled to, and the finding in favor of the invalidity of the paper ought not to be disturbed.

We have carefully examined the other questions made by the plaintiffs in error, including that in regard to the want of jurisdiction because of an alleged insufficient service of process, but we are satisfied that no error has been committed, and the judgment must, therefore, be

*Affirmed.*