## HUMPHREY   v.   ERIE R. CO.

United States District Court
S. D. New York.
Nov. 16, 1953.

William L. Standard, New York City, Morton J. Heckerling, New York City, of counsel, for plaintiff.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, J. Roger Carroll, New York City, of counsel, for defendant.

WEINFELD, District Judge.

Plaintiff sues under the Federal Employers' Liability Act[1] to recover damages for injuries sustained while in the defendant's employ as a tractor operator.

A principal issue is the effect and validity of a general release signed by the plaintiff on April 30, 1948, more than a year after the accident while still in the defendant's employ. The plaintiff claims that the release was intended to cover only wages lost by reason of the accident and due him up to the date of the release.

The accident occurred on April 7, 1947. Plaintiff was alighting from a tractor he was operating and stepped into a pool of oil, which had accumulated on the cement floor of the pier as a result of leakage from a defective tractor, causing him to slip and to be thrown to the ground. He sustained injuries to his left leg and knee. He was examined the next day by the railroad's resident doctor, who diagnosed his condition as a strain of the calf muscle of the left leg. Although plaintiff suffered pain, he continued at work the first few days after the accident; but toward the end of April, due to intensity of pain in his leg and knee, he was forced to remain at home. He returned to his employment in May and worked regularly until May 24th, when his left knee gave way, and again due to pain in his leg, was out of work until June 2nd. In the interval he was examined and treated by the defendant's doctor.

On June 2nd, the doctor issued a slip indicating that plaintiff was again fit for duty and directed him to the company's claim agent. On this occasion the plaintiff received $30. Plaintiff states he was told this sum covered the five or six days wages he lost after the May 24th incident. He was required to sign a general release, which recited the payment of $30 and the discharge of the defendant from all "liability for damages of every kind, nature or description that has arisen by reason of or may hereafter in any manner grow out of any and all personal injuries, whether known or unknown, permanent or otherwise." The release also contains a final clause in the plaintiff's crude handwriting, as follows:

"I understand that the sum of $30.00 is all I am to receive for this release and nothing else has been promised me. Kenny Humphrey."

Plaintiff's version of the circumstances attendant upon this transaction is that he was told by Wynne, the defendant's claim agent, that some wages were due him and papers were to be filled out; that Wynne had handwritten something on a piece of paper which plaintiff was asked to copy on to another paper, which he did (the final clause in the release); that he could neither read nor write. Plaintiff also testified that he had attended school in Batesburg, South Carolina, for one term; that he had never learned to read or write there, although he now can sign his name; that a well-disposed employer once taught him his ABC's. As a result, although he cannot read words, he can decipher each letter, "letter by letter," copy them, but does not understand the meaning of most written words. He testified that he could not understand nor read the release or handwritten clause which he wrote thereon; that when he copied the clause he did not know what he was writing. Plaintiff also testified that Wynne told him the $30 payment covered wages lost during the last days of May and, further, that the paper meant nothing else had been

1. 45 U.S.C.A. § 51 et seq.

promised to him. The total time lost by plaintiff due to his injuries from April 7th, the date of the accident, to June 2nd, when he received the $30, was 20 days, excluding Sundays. His daily wage rate was approximately $7.75.

Wynne contends that he told plaintiff the paper was a general release and the $30 payment was in settlement of his claim and in full discharge of all liability of the railroad; that it would be necessary in accordance with the defendant's custom for plaintiff to write the clause in his own handwriting; that plaintiff said he could read but was shaky in handwriting, whereupon he, Wynne, wrote out the clause on a separate piece of paper, explaining its meaning, and then had plaintiff copy it onto the release. Wynne admits he did not read the release itself to the plaintiff.

For the next three or four months plaintiff worked with fair regularity until October 13th, when he was out for several weeks. During this period he was treated by the company doctor on the average of once a week and also received diathermy treatment at a hospital on the average of three times a week. Recurring attacks of sinovitus in the left knee with pain and swelling in the quadriceps tendon were noted. Absence from work increased. Humphrey was out 18 days in November and all of December, 1947; most of January, and all of February, March and April, 1948. He went to Wynne for funds. Notwithstanding the release of June, 1947, the defendant through Wynne and other claim agents on six different occasions from November 1947 to April 1948 advanced to the plaintiff various amounts totalling $175. In each instance plaintiff signed a receipt which authorized the deduction of the advance "from any settlement which hereafter may be made with me, or shall be deducted from any judgment or award which may be entered in my favor and against the Erie Railroad Company by reason of or in connection with personal injuries sustained."

Apparently the injury did not respond to treatment, which from the date of the accident to February, 1948, appeared to consist of diathermy and medication. In February, 1948, the defendant's doctor decided that plaintiff had a torn cartilage in his left knee and recommended its removal. Plaintiff was sent by defendant to St. John's Hospital in Cleveland, where he was operated on early in March, 1948, and cartilage or portions thereof were removed from his left knee. He returned from Cleveland on March 18th and reported from time to time to the company doctor, who in early April found fluid on the knee, which was also swollen, but improvement was noted thereafter.

On or about April 30, 1948, after he had been out of work six or seven months, the company doctor found him fit for duty May 1st and issued a slip to that effect to the claim office, which plaintiff presented to Wynne. The controversy centers about the release signed by the plaintiff on this occasion. Plaintiff claims that Wynne again advised him that papers were to be filled out and that the latter, together with another claim agent, Finck, computed his wages lost at $1,000, from which they deducted monies which plaintiff had received from the Railroad Retirement Board and the $175 previously advanced by the defendant, showing a balance of $451.50. Plaintiff testified that he refused to accept the sum because the wages lost during the seven-month period totalled more than $1,300. According to his story, he left, but returned the following day, after his wife had stressed their financial plight. He then agreed to accept the $451.50, but insists that it represented wages and was so told by Wynne; further, he displayed his knee, which was swollen, and was told if anything went wrong to return. Plaintiff testified that Wynne, as on the occasion of the signing of the release of June 2, 1947, prepared a handwritten statement which he copied onto another paper; that after he signed it Wynne read the clause to him and told him it meant nothing else had been promised; that he understood this to mean the money was all he was to receive for wages

lost up to that date; that wages was the sole subject of their discussion; that nothing was said about settling his case or giving up any rights or claim he might have against the company. Plaintiff again swore that he could neither read nor understand the clause in Wynne's handwritten paper, although he was able to copy it onto the release.

Wynne and Finck, the other claim agent, agree on a different story: that plaintiff presented a slip issued by defendant's doctor indicating he was ready to resume work and that he wanted to settle his case; that they arrived at a settlement of $1,000 and after computing the deductions for reimbursement, which left a balance of $451.50, the plaintiff said he wanted to think it over; that he returned the same day and said he would accept the amount offered, whereupon Wynne prepared the general release and also the "usual clause" for the plaintiff to write in; that he advised plaintiff it would release any further claim against the Erie Railroad Company; that plaintiff said he understood it and then wrote the clause into the release and signed it, whereupon Wynne gave him the check for $451.50. Both deny that he was told he was getting only wages or that if things did not go right to return. Both concede that the terms of the release were not read to plaintiff. All that was read to plaintiff was the clause which he had written and copied and its meaning explained. Wynne further admits that he did not at any time advise plaintiff that he had any rights with respect to any claimed negligence of the defendant nor did either of the claim agents inform him that he had a right to assert a claim which, in the event he were successful, would include damages for pain and suffering, permanency of injuries and loss of wages. Wynne acknowledged he had no reason to dispute that plaintiff lost a total of 183 working days by reason of the injuries, which at his rate of pay meant a loss of wages of $1,327.40.

Upon a review of the evidence, and based upon observation of the witnesses and their demeanor, I accept the plaintiff's version of the transactions and find that he has sustained his burden of proof.[2]

Plaintiff is illiterate, of meager education and limited intelligence. He is unable to read or write, although capable of signing his name and copying script. Whether he had four terms schooling, as defendant contends, or one term, as plaintiff asserts, is quite irrelevant. The fact is that he lacked understanding and knowledge of the effect of the general release and its terms were not explained to him. He was not represented by counsel, nor did he have the benefit of independent advice when he signed the release. He relied solely upon the defendant's claim agents and physician. Plaintiff was led to believe by the actions and statements of the defendant's claim agents that the release of April 30, 1948, covered only his claim for wages lost up to that date.

Plaintiff's claim that the release discharged only lost wages is supported by the very versions given by the defendant's two claim agents of events attendant upon its signing and the discussion thereat as to the amounts due the plaintiff and the deductions to be made from the $1,000 for repayment to the Railroad Retirement Board and the defendant for advances. It is emphasized by the prior dealings with plaintiff in connection with the first release, when he received $30, and the events subsequent thereto. In the instance of the first release, just as in the case of the second, the claim agent states the payment was in full settlement of plaintiff's claim and he informed Humphrey that it was a release of all claims and that he would receive no additional money. Yet it is significant, notwithstanding the broad terms of this first release, funds were advanced to the plaintiff on six subsequent occasions. Each receipt signed by plaintiff states that the advance "shall be deducted from any set-

2. Callen v. Pennsylvania R. Co., 332 U.S. 625, 68 S.Ct. 296, 92 L.Ed. 242.

tlement which hereafter may be made with me, or shall be deducted from any judgment or award which may hereafter be entered in my favor and against the Erie Railroad Company by reason of or in connection with personal injuries sustained by me * * * on or about April 7, 1947." Also significant is the fact that one of the receipts provides:

"I understand and agree that my claim for the above mentioned personal injuries *was* settled on June 2nd, 1947." (Emphasis supplied.)

If plaintiff had, in fact, been informed as is now asserted, that the first release was absolute and fully discharged defendant's obligation to plaintiff, what claim remained in his favor which would lead to a "settlement * * * judgment or award" from which advances could be deducted? The advances made by the defendant in the face of the unrestricted terms of the release corroborate plaintiff's position that the first release was limited to wages lost to the date and constituted a receipt evidencing the payments. Thus support is given to his claim that when the second release was signed under circumstances substantially similar to the first, he understood, and the parties intended, that the $1,000 payment covered only wages lost to the date of the release.[3]

Apart from the foregoing, plaintiff's insistence that the sole subject of discussion at the signing of the April 30th release was wages lost, their computation and repayment of monies to the Railroad Retirement Board and to the defendant, finds support at several points in the testimony of the claim agents.[4]

Finally, the amount of the settlement gives credence to the plaintiff's contention that the release was limited to the wages lost. Adequacy of consideration and the nature of medical and legal advice available to plaintiff are relevant in determining the scope of the release.[5]

From June 2, 1947 to April 30, 1948, plaintiff had been away from work a total of 285 days, of which 183 days were work days, representing a loss of wages of $1,327.40, exclusive of possible overtime earnings. It is not disputed that his injuries were excruciatingly painful. After almost a year of suffering he had been operated upon to remove torn cartilage. All these facts were known to the defendant. No question was raised by Wynne that plaintiff came by his injuries as he claimed. While this is no admission of negligence on the part of the defendant, it does mean that defendant did not consider plaintiff's claim lacking in substance. Under these circumstances a payment which is $300 less than the

3. A suggestion made by one of the claim agents that the 1948 release was intended to cover the incident of May 24, 1947, when plaintiff's knee gave way, is negated by the release itself which makes specific reference to the accident of April 7, 1947.

4. (Wynne):
"Q. * * * [D]id you, in his presence, compute the number of days that he *was* out of employment following April 7, 1947? A. Yes, I did, sir. I would have to do that to arrive at the $1,000 figure.
"Q. And that was done in his presence? A. Yes, sir.
"Q. You have heard him testify that he understood that he was disposing of his claim for wages? A. * * * [Y]es.
"Q. And that nothing was said about other liability? A. Yes * * *.
"Q. * * * [D]id you say anything about any other possible liability that he *was* releasing against the railroad

company? A. No, sir. I explained to him that this was in full release of any claims he had against the railroad company.
"Q. But you did not explain what any other claims meant? A. No, sir, not specifically." (S.M. 181–182.)
(Finck):
"Q. * * * [A]t all times prior to the conversation with Humphrey and prior to the amounts that were being offered to him, only his wages were being computed, is that correct? A. We used his wages as a basis of arriving at the settlement. We had to use his wages.
"Q. And that was the only thing that you took into consideration, was his wages? A. That is right." (S.M. 195.)

5. Garrett v. Moore-McCormack Co., 317 U.S. 239, 248, 63 S.Ct. 246, 87 L.Ed. 239, and footnote 17; The S. S. Standard (Bonici v. Standard Oil Company of New Jersey), 2 Cir., 103 F.2d 437, 439.

special damages corroborates plaintiff's version that the parties intended to discharge only the wage claim to the date of the release; otherwise if the agent's subjective intention [6] was to discharge defendant's liability for pain, injuries and permanency, the amount is woefully inadequate and leaves defendant open to a charge of overreaching.

The defendant's course of conduct in dealing with plaintiff subsequent to the first release, the circumstances surrounding the execution of the second release, and the amount of the payment, warrant the conclusion that plaintiff was given to understand, and so understood, and the parties intended, that like the prior release, that of April 30, 1948, covered only wages lost to that date, and was not a general release discharging the defendant from all liability. Accordingly, the release is no bar to the maintenance of this action to recover other damages resulting from the accident.[7]

■ Moreover, even if it be assumed arguendo that the release was intended to discharge all liability, the evidence sustains a finding that it was signed under a mutual mistake of fact, or upon a misrepresentation made by the defendant's agent, as to plaintiff's physical condition and the lack of any permanent injury.[8]

Plaintiff and defendant's claim agents relied upon a printed slip issued by the company physician on the day of, or shortly before the signing of the release certifying that the plaintiff was fit to return to work on May 1, 1948. In fact, plaintiff was unfit to work on that day and was still suffering from the effects of his injuries, so much so that the doctor

gave him an additional two weeks—until May 13th—before again requiring him to report for duty. Plaintiff worked regularly thereafter until the end of July and then intermittently until November 18th, when, due to the increasing severity of pain in his knee and its injured condition, was compelled to forego his employment. He remained out of work for nearly four years, although I do not find that he was totally disabled from working during this entire period. Up to November, 1948, the only treatment plaintiff received was from the physician and the surgeon employed by the defendant. In January, 1949, he engaged his own doctor, who found that plaintiff walked with a limp, his left knee and ankle were swollen and he had a 25% restriction of flexion of the knee, a permanent condition. Plaintiff received medical treatment over a period of time in 1949. An examination in 1953 showed that he had the same limp, the same restriction, but more tenderness and pain when he tried to walk. The medical testimony that the injuries and the condition were solely attributable to the accident of April 7, 1947, is uncontradicted. The injuries were described as severely painful. The permanent disability results from a torn meniscus of the left knee joint.

■ None of the parties, neither plaintiff nor the defendant's claim agents and its doctor, knew of any permanent injury. In fact, Wynne states he was advised, following plaintiff's return from the Cleveland hospital, that there was no permanency of injury. Finck testified that he had no knowledge as to any prognosis of plaintiff's condition; that the defendant had no information from

6. Cf. Zell v. American Seating Co., 2 Cir., 138 F.2d 641, 647; Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 761.

7. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757; Chesapeake & Ohio R. Co. v. Howard, 178 U.S. 153, 167, 20 S. Ct. 880, 44 L.Ed. 1015; Farrington v. Harlem Savings Bank, 280 N.Y. 1, 19 N. E.2d 657.

8. The S. S. Standard (Bonici v. Standard Oil Company of New Jersey), 2 Cir., 103 F.2d 437; Stuart v. Alcoa S. S. Co., 2 Cir., 143 F.2d 178; Scheer v. Rockne Motors Corporation, 2 Cir., 68 F.2d 942, 945; Steele v. Erie R. R. Co., 2 Cir., 54 F.2d 690; Brown v. Pennsylvania R. Co., 2 Cir., 158 F.2d 795; Great Northern Ry. Co. v. Fowler, 9 Cir., 136 F. 118, 119, 121; Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819; Tulsa City Lines v. Mains, 10 Cir., 107 F.2d 377, 381.

the Cleveland surgeon who operated upon plaintiff; and that he relied upon the slip issued by the company's doctor that Humphrey was qualified to return to work. The doctor testified that when he issued the work slip he did not have a report from the Cleveland hospital and that all he knew, and this through the defendant's claim department, was that the cartilage had been removed. But more important, the doctor conceded that he could not ascertain whether or not the injury would be permanent for a year after the operation—a fact not disclosed to the plaintiff. Certainly plaintiff's permanent injury was not taken into account. Thus it is beyond question that all parties considered the injury much less serious at the time the release was given than it eventually turned out to be, and having acted under a mutual mistake of fact as to plaintiff's true condition, the release is rendered invalid.[9]

There is still another factor which requires that the release be condemned, but upon another ground.

As to plaintiff's condition and prospect of permanency, the company doctor testified as follows:

"Q. And on the 1st of May you were satisfied that he was fit to go back to work? A. I was, or I would not have let him go back.

"Q. * * * [A]t or about that time did you make any observation as to whether or not there was any condition of permanency as a result of the removal of the cartilage? A. No, I did not. * * * [I]t has been my procedure not to estimate permanency after any injury or any operation for at least a year, because we don't know what the end result is going to be, for a man might be returned two or three months after an injury, the joint might look as

though it would be permanently disabled and a year later you find a normal condition. It is foolish to estimate permanency following any bone fracture or joint pathology until at least eight months after an operation has elapsed. * * *" (S.M. 269–270.)

The release was signed some six weeks after plaintiff's operation. The failure to advise plaintiff that a determination of permanency following the operation could not reasonably be made until a year after the date of the release constituted either a further representation that plaintiff's condition was sound or concealment of a material fact; particularly so, since up to this point and for some six months thereafter the only physician treating the plaintiff was the defendant's doctor.

The failure to disclose this vital information to plaintiff, even though innocent and devoid of improper motive, was for all practical purposes a representation that there was no prospect of permanency of injury. This goes beyond prophecy or even mistaken opinion of the plaintiff's injury. It was the withholding of material information as to a present fact—that no determination of possible adverse developments with respect to permanency could be made until at least eight months to a year after the operation, 6½ to 10½ months after the signing of the release. Considered in the light of the issuance of the work slip, this was tantamount to misrepresentation to plaintiff as to his condition.[10] The defendant's agents knew that this information would seriously affect the amount of the settlement and induce the plaintiff to consent. A layman who is certified as fit for duty and who is not advised by the company doctor from whom he has been receiving treatment

9. Scheer v. Rockne Motors Corporation, 2 Cir., 68 F.2d 942, 945; Ciletti v. Union Pac. R. Co., 2 Cir., 196 F.2d 50; Tulsa City Lines v. Mains, 10 Cir., 107 F.2d 377, 380; Thompson v. Camp, 6 Cir., 163 F.2d 396; Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819.

10. Cf. Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819, 825; Thompson v. Camp, 6 Cir., 163 F.2d 396, 401.

that only time will yield the medical information as to the permanency of injury following an operation, has the right to assume a representation has been made and there is no prospect of permanency.

"There is indeed no absolute line to be drawn between mistakes as to future, and as to present facts. To tell a layman who has been injured that he will be about again in a short time is to do more than prophesy about his recovery. No doubt it is a forecast, but it is ordinarily more than a forecast; it is an assurance as to his present condition, and so understood." [11]

Thus, the release is rendered invalid upon two grounds: (1) mutual mistake of fact in that at the time the release was signed the parties were without knowledge that plaintiff had a permanent injury and acted upon the assumption that his condition was less serious than it eventually turned out to be; and (2) misrepresentation by reason of the defendant's failure to disclose to plaintiff that his true condition could not reasonably be estimated until a substantial period after the date of the release.

■ There remains the question as to whether or not the defendant was guilty of negligence on the 7th day of April, 1947. The evidence warrants the finding that oil had been leaking for a number of days from one of the tractors used on the dock where plaintiff was employed and that as a result a pool of oil had accumulated into which the plaintiff stepped as he was alighting from his tractor, causing him to slip and to sustain the injuries. The oil was there for several days before the accident, a sufficient period to charge the defendant with knowledge of the condition which constituted a hazard to the men engaged there. The defendant failed in its duty to use reasonable care to provide a reasonably safe place for plaintiff in which to work.[12] The accident occurred through the sole fault of the defendant and was the proximate cause of all the injuries sustained by the plaintiff. Causal relationship was abundantly established. The pain and suffering, the nature and extent of the permanent injury and the period of disability have already been referred to.

Plaintiff is awarded the sum of $7,470. In making this award I have credited the defendant with the payments made to the plaintiff up to April 30, 1948, under both releases.

■ The defendant urges that plaintiff is barred from recovery because of failure to return the monies réceived. Since the primary finding is that the release of April 30, 1948, only discharged plaintiff's claim for wages up to that date, the defense fails.[13] Likewise it fails in view of the further findings invalidating the releases.[14]

The motions made by the defendant to dismiss at the end of the plaintiff's case and upon the whole case on the ground that the release is a bar to plaintiff's recovery are denied.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Judgment to enter in accordance with the foregoing.

---

11. Scheer v. Rockne Motors Corporation, 2 Cir., 68 F.2d 942, 945.

12. Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610.

13. Lumley v. Wabash R. Co., 6 Cir., 76 F. 66; Farrington v. Harlem Savings Bank, 280 N.Y. 1, 19 N.E.2d 657; Carroll v. Delaware, Lackawanna & Western R. Co., 299 N.Y. 705, 87 N.E.2d 123.

14. Irish v. Central Vermont Ry., 2 Cir., 164 F.2d 837.