## STUTHMAN v. UNITED STATES.
### No. 9705.

Circuit Court of Appeals, Eighth Circuit.
Nov. 8, 1933.

C. A. Wilson and E. B. Adams, both of Hot Springs, S. D., for appellant.

E. D. Barron, Asst. U. S. Atty., of Sioux Falls, S. D. (Olaf Eidem, U. S. Atty., of Sioux Falls, S. D., and Byron S. Payne, Asst. U. S. Atty., of Pierre, S. D., on the brief), for the United States.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an action on a contract of war risk insurance, in which the pleadings are in conventional form.

The parties will be referred to as they appeared in the lower court.

After a jury had been impaneled and sworn, one of plaintiff's attorneys made an opening statement of the case to the jury, reciting that before the war plaintiff was an able-bodied man, able to do the hardest kind of farm work; that he enlisted in the service, was sent to Fort Riley, Kan. and then transferred to Camp Cody, at Deming, N. M.; that he took out a policy of war risk insurance, the premiums on which, during his service, were deducted from his monthly pay as a soldier; that the policy was kept in force by payment of premiums to the 1st of May, 1920; that he was totally and permanently disabled while the policy was in force; and then, after reciting plaintiff's various vicissitudes while in the service, his sickness, and his hospitalization, his honorable discharge at Camp Cody on December 10, 1918, and his return to Hot Springs, S. D., the attorney stated, referring to plaintiff:

"He had a severe and persistent cough; unable to sleep; nervous, suffered from loss of appetite; had headaches; was so incapacitated that he was unable to do any work whatever. He went out to his father's ranch and tried to work, but his experience would be that just as soon as he tried to do anything he would tire out and have to go and lie down. He was not even able to do the light work on the farm, such as the ordinary chores around the farm; could not even stand that. His condition then was that whenever he tried to work he just had to quit. In October, 1919, he consulted a doctor, Dr. Young of Hot Springs. All during that winter he became considerably weakened and lost a lot of weight. He was unable during the next spring to pay any further premiums on his policy of War Risk Insurance. As already stated, the last premium he paid was the following spring, March, 1920. He remained on his father's ranch for about two years. On January 14, 1921, he entered Battle Mountain Sanitarium, the government hospital at Hot Springs. He took some treatment there, and in June of the same year, the government sent him to Sioux Falls for vocational training. The government at that time was trying to train ex-soldiers who were unable to follow their pre-war occupation, for some occupation that they might follow. * * * They started Mr. Stuthman in for training in a business course, bookkeeping in a commercial college in Sioux Falls, but his condition was such that he was unable to accomplish anything in this course, so they changed him to laundry work; thought he might be able to be a laundry executive. This training was given him in Minnesota. He lasted in that sort of work about two weeks. Then he broke down; couldn't stand that. He returned to Sioux Falls and attempted to continue with the course in bookkeeping. He was unwell.

He had to be absent part of the time, and consulted various doctors at the Veterans' Bureau, and he continued to try to learn bookkeeping until early in 1923. The government then decided that he was not able to do this, so they tried to give him replacement training with the Fischer Printing Company. This work was a trifle harder than what he had been trying to do, and again in two weeks he suffered a serious breakdown and had to go to a hospital in Sioux Falls. From Sioux Falls he was transferred to a hospital in St. Paul, Minnesota. This was early in 1923. Previous to that he had received some diagnosis of pulmonary tuberculosis, but the diagnosis he got in St. Paul was pulmonary tuberculosis, active and chronic, and the doctors recommended a transfer to Arizona, so he was sent to Arizona for treatment for active tuberculosis. Here he remained for a period of more than a year. In July, 1924, he took his discharge and the information that he received was at that time that his case was apparently arrested. That is, he was no longer actively tubercular. He was not cured, but the disease had, for the time being at least, ceased to be active. He returned to Hot Springs and went out on the farm, and, of course, during all of this time he had not been able to do any work whatever, except what he did in connection with trying to take training. In August, 1924, he consulted doctors at Battle Mountain Sanitarium. He was sent to Sioux Falls in December. Came back to Hot Springs and stayed on the ranch, but was unable to do anything. He went to Sioux Falls in June, 1925, and then returned again to the farm. Nothing particularly done for him except that he was examined and he stayed there until January, 1926, when he again entered Battle Mountain Sanitarium at Hot Springs. He has been a member of Battle Mountain Sanitarium at Hot Springs ever since 1926, and still is. Since he has been in Battle Mountain Sanitarium he has done what is called membership work. This started in June, 1926. In one of these government hospitals as they have at Hot Springs, there are, of course, civilian employees to take care of the important work. But there are a lot of things about a hospital, light duties, than can be done by the members after they become able to get up and get around. That isn't really work in the sense that work is ordinarily understood. The work that is done there consists, as I say, of these light duties. The first thing that Mr. Stuthman did after he became a member and after he started to do this membership work, was in a surgical ward, where he waited on patients for short periods of time. He reported for duty twelve hours a day, but very little of this time was he working, and he was in position where he could lie down and rest whenever he needed to. However, this work was a little more than he was able to stand, so in about six months he was transferred to what is known as pantry guard, in the same ward. Here he had to pour the coffee and see that food was taken to bed patients in that ward. He stayed in this position about two years. Then he was made what is called messenger. This was even lighter work than he had done before. About all he had to do was sit at a desk in the rotunda of the Administration Building and answer questions of visitors, and every once in a while take papers from one office to another office. He continued as a messenger for about two years. All of these jobs paid him forty dollars a month. In March, 1931, he was put in the Adjutant's office at Battle Mountain Sanitarium, and here he stayed five and one-half days a week. His duties consisted of filing papers, looking up records, and things of that sort in that office. The record will show that he had leave of absence, and that he now receives at this so-called job the sum of sixty dollars a month. We expect to show that he has a wife and two children; that he has done the best he can under the severe handicap of pulmonary tuberculosis, and that as late as June 16, 1931, the examination board of the Veterans' Bureau gave it as their opinion that his disability was permanent and total. He cannot now, and has not since March, 1921, and never will be able to follow a substantially gainful occupation. His physical condition is such that it is likely, and it is a fact, it is certain that it will continue throughout his life time."

Upon this opening statement of counsel for plaintiff, counsel for the government moved for judgment for the defendant for the following reasons:

"That it appears from the statement of counsel to the jury that the plaintiff in this case, in 1924, was shown to have been in a condition whereby there was an arrested case of tuberculosis of the lungs, and that that being the basis of the claim for total and permanent disability, there is no evidence that can be submitted or introduced under the statement of counsel subsequent to the year 1924, the policy being admittedly at that time in default.

"For the further reason that the statement of counsel conclusively shows that ever since 1926, that the plaintiff has been en-

gaged in a substantially gainful occupation, and conclusively shows that there was then and is now and ever since that time has been, no permanent and total disability within the meaning of the act."

■ The court sustained this motion, and the plaintiff excepted. From the judgment of dismissal entered pursuant to this ruling of the court, plaintiff has appealed. The cause has been briefed in this court upon the theory that the motion for dismissal on the opening statement of counsel should be tested by the same rule as that applicable to a motion for a directed verdict on the undisputed evidence. But the opening statement of counsel is not intended to take the place of pleadings, but is intended to advise the jury concerning the facts involved so as to prepare their minds for a better understanding of the evidence to be heard. Its purpose is to give the jury an idea of the nature of the action and defense. How elaborate it shall be made is largely left to the discretion of the attorney, but to relate the testimony at length would not be good practice nor ordinarily tolerated. It is only when the opening statement of counsel clearly affirmatively shows that plaintiff cannot recover that the court will grant judgment or direct a verdict thereon. Illinois Power & Light Corporation v. Hurley (C. C. A. 8) 49 F.(2d) 681, 684; Coffeyville Min. & Gas Co. v. Carter, 65 Kan. 565, 70 P. 635; Brashear v. Rabenstein, 71 Kan. 455, 80 P. 950, 951; Stewart v. Rogers, 71 Kan. 53, 80 P. 58; Emmerson v. Weeks, 58 Cal. 384; Redding v. Puget Sound Iron & Steel Works, 36 Wash. 642, 79 P. 308; Brooks v. McCabe & Hamilton, 39 Wash. 62, 80 P. 1004; Gross v. Bennington, 52 Wash. 417, 100 P. 846.

In Illinois Power & Light Corporation v. Hurley, supra, we said: "It is doubtless within the power of the trial court to direct a verdict on the opening statement of counsel, but this should not be done unless it clearly appears from the plaintiff's opening statement that he cannot recover. The rule is only applicable where the statement clearly shows that no cause of action exists. To warrant the court in granting such a motion, it is not enough that the statement of counsel be defective, but it must affirmatively appear therefrom that no cause of action in fact exists."

As said by the Supreme Court of Kansas in Brashear v. Rabenstein, supra: "The pleadings make the issues, and not the statements, and, no matter how deficient a statement may be from an artistic standpoint, or

what its shortcomings may be in the estimation of the critical attorney on the other side, the court is not authorized to end the case because of it, unless some fact is clearly stated, or some admission is clearly made, *which evidence relevant under the pleadings cannot cure, and which, therefore, necessarily and absolutely precludes recovery.*" (Italics supplied.)

■ We shall not attempt an analysis of this opening statement, nor in our view of the case is it necessary to make any reference to the law applicable to these war risk insurance cases. It is sufficient to say that under the pleadings relevant evidence might have been submitted which would have sufficiently supplemented the facts as outlined in the opening statement to entitle plaintiff to have the issues in this case submitted to a jury. As to the sufficiency of the evidence as outlined in the opening statement of counsel, we express no opinion whatever, but decide this case solely on the question of practice.

We think the opening statement of counsel does not necessarily show that plaintiff cannot recover, and hence the court erred in directing a dismissal of the action thereon.

The judgment appealed from is therefore reversed, and the cause remanded, with directions to grant the plaintiff a new trial.