Sheila Ilina **BOLAND**, etc., **Appellant**,

v.

**J. Spencer LOVE, et al., Appellees.**

No. 12240.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1955.

Decided March 17, 1955.

Petition for Rehearing In Banc Denied April 7, 1955.

Bastian, Circuit Judge, dissented in part.

---

Messrs. George E. Allen and Wilbur C. Allen, Richmond, Va., of the bar of the Supreme Court of Appeals of Virginia, pro hac vice, by special leave of Court, for appellant.

Mr. Warren E. Miller, Washington, D. C., was on the brief for appellant.

Mr. John P. Labofish, Washington, D. C., entered an appearance for appellant.

Mr. J. Harry Welch, Washington, D. C., with whom Messrs. H. Mason Welch and John R. Daily, Washington, D. C., were on the brief, for appellees.

Before BAZELON, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

Appellant (plaintiff) sought damages for injuries sustained when she was struck by an automobile near Ashland, Virginia. The car belonged to Robert Lee Love, son of J. Spencer Love, both appellees here, (defendants in the District Court). Defendants resided in the District of Columbia but both were away when one Coates, without permission, took Robert's car from the garage on the father's Washington premises where Coates was employed as a gardener and yard man. Pertinent allegations appear in the margin.[1] At the conclusion of plaintiff's opening statement, the trial judge granted defendants' motion for a directed verdict. This appeal turns on whether or not the trial judge mistakenly so ruled. He succinctly summed up the whole issue thus: ". . . if the plaintiff proves everything that she has said she is going to prove in her case, as a matter of law there still will be no case to go to the jury."

So far as may be pertinent to the inquiries we must explore, we draw upon the plaintiff's opening statement. At the time of plaintiff's injury, defendant J. Spencer Love owned premises at 3200 Ellicott Street, N. W. in Washington where he kept several automobiles including a Pontiac owned by his son Robert Lee Love. Prior to the events in suit, the son had entered the Army leaving his car at home in care of one Hamilton, his father's employee and private secretary. The other cars, property of the father, were also left in charge and under control of Hamilton.

A man named Anderson was employed just ahead of Coates. Coates was

1. "On and before January 23, 1951, the defendants were the owners and had under their control a certain 1949 Pontiac convertible automobile which they kept and maintained for their use upon their premises at 3200 Ellicott Street, N.W., Washington, D.C. The said automobile on and before January 23, 1951, was negligently left on said premises by the said defendants unlocked with the ignition key in the automobile, freely accessible to one James Coates, a servant of the defendants as gardener and handy man in and about the premises. The said Coates was on January 15, 1943, con- victed in the courts of the District of Columbia of house breaking and larceny, and sentenced to serve a term of thirty-two months to eight years. He was released on parole on September 13, 1948. From April, 1949, until his discharge from parole on January 14, 1951, and thereafter until the date of the collision, hereinafter referred to, he was in the employ of the defendants as aforesaid. The said defendants and each of them knew of the said conviction of the said Coates, his parole, and that he could not with safety be trusted with an automobile."

employed as his assistant, as a gardener and yard man, that is by Mr. J. Spencer Love. Before the accident, Anderson left and "left Coates there to perform the services that had been performed" by Anderson. Among Coates' duties "when the family was there," was that of driving the automobiles around to the front door. When the family was "not there" and the automobiles or "any of them were left on the premises, he was supposed to start the automobiles up and run them idle, so to speak, so as to keep them alive or keep the batteries from dying, and perhaps wash the automobiles."

A few weeks before the accident, the father locked up the house, left it and went away for several months. "He left Mr. Hamilton, the employee-secretary there, supposedly to supervise Coates, look after the automobiles and what not, but Mr. Hamilton worked in the office downtown and so in the morning he would leave and go to the office and leave Coates on the premises. So, on the morning of January 23, 1951, with Mr. Love and his family away, . . . excepting Mr. Coates, Mr. Hamilton left the house that morning leaving no one there to supervise Coates in any way, shape or form, and Coates finding himself on the premises with no one to supervise him, took the automobile and drove it down into Virginia."

In order that Coates might perform his duties,

". . . the automobile keys were sometimes given to the maids when they were in the house, with the instructions to give them to Hamilton, and if none of them were there, the keys were placed over the sun visor or windshield.

"On this morning . . . Mr. Hamilton placed these keys—according to Coates—over the windshield and told him where the keys were and to take the car and start it up and charge the batteries. But he did not give him any permission, of course, to drive the car off the premises.

"So, Coates, with no one there to supervise him or control him, took the automobile, went down into Virginia and, coming back, according to the evidence, was a little late and was hurrying to get back to Washington before Mr. Hamilton got back from work, and had this accident.

"Now, the evidence will further show that Coates, I believe back in his teens, was convicted of stealing and again convicted of stealing when he was about twenty-two. He was too young to serve or go to the penitentiary on the first conviction, but he was sent to some training school here and confined there for his infractions of the law, and then he was convicted about twenty-two and given 32 months, I believe, to five years in prison.

"Let's see if I can get the dates here now. On September the 13th, 1948, he was released from prison under supervision of the parole officer, was reporting to the parole officer. In the early part of '49, I believe it was, he was employed by Mr. Love, and he completed his parole, I believe, on January 14, 1951.

"Now, the evidence will show that Mr. J. Spencer Love and his servant and employee, Mr. Hamilton, knew the record of James Coates; knew that he was untrustworthy, that he had been twice convicted of stealing and had served in prison almost half of his time after he got ten years old, and the evidence will show that they knew that he did not have a driver's license and that when they went away and left him without any supervision, it is our claim that they were negligent in thus entrusting these automobiles to this man, and it is that negligence upon which we base our claim."

Linking the foregoing to the events involving plaintiff's injury we may briefly note that on the afternoon of January 23, 1951, a school bus, carrying the plain-

tiff with other school children, stopped on the right side of Route 1 highway, headed toward Richmond. On the bus red blinker lights were operating with the word "STOP" in the middle of the lights. A patrol was placed in the middle of the highway with a red flag, flagging down traffic. The driver of a Buick automobile, heading north, in response to such signals had brought his car to a dead stop for at least a minute, while children were alighting from the school bus and crossing the road. Thereupon, Coates also driving north at a speed estimated between 50 and 70 miles an hour skidded some 60 feet, struck and knocked the standing Buick some 40 to 50 feet north. Then Coates swerved to his left, skidded 40 to 50 feet more as the car crossed the southbound lane and struck the 13-year-old plaintiff as she stood in front of the bus. She had not gone into the highway, and thus was pinned against the bus and severely injured. Concluding this portion of the opening statement plaintiff's counsel said "Shortly after the accident the driver left the scene."

## I

Conformably to Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, a federal court will follow the rule of the state of the forum on a question of conflicts of laws. "In Pennsylvania, it is well settled that, in the absence of evidence to the contrary, the common law of another common law state is presumed to be the same as the common law of Pennsylvania." Waggaman v. General Finance Co., 3 Cir., 1940, 116 F.2d 254, 257; Petersen v. Chicago, G. W. Ry. Co., 8 Cir., 1943, 138 F.2d 304, 305, 149 A.L.R. 755; Mattox v. News Syndicate Co., 2 Cir., 1949, 176 F.2d 897, 901, 12 A.L.R.2d 988, certiorari denied, 1949, 338 U.S. 858, 70 S.Ct. 100, 94 L.Ed. 525; Pierce v. Ford Motor Co., 4 Cir., 1951, 190 F.2d 910, 915, (the last two cases applying to tortious injury in Virginia).

In the District of Columbia Circuit we have applied the law of Virginia in actions brought here where the injury occurred in Virginia, as in Rubenstein v. Williams, 1932, 61 App.D.C. 266, 61 F.2d 575; United States v. Morow, 1950, 87 U.S.App.D.C. 84, 182 F.2d 986. Our courts, as is true of federal courts generally, will take judicial notice of the laws of the several states, Moore v. Pywell, 1907, 29 App.D.C. 312, 324, 9 L.R.A.,N.S., 1078, whether pleaded or not, Kaye v. May, 3 Cir., 1924, 296 F. 450, 453; Parker v. Parker, 10 Cir., 1936, 82 F.2d 575, 577. But *lex loci delicti* governs, Giddings v. Zellan, 1947, 82 U.S.App.D.C. 92, 160 F.2d 585, certiorari denied, 1947, 332 U.S. 759, 68 S.Ct. 61, 92 L.Ed. 345; Kas v. Gilkerson, 1952, 91 U.S.App.D.C. 153, 155, 199 F.2d 398, 399, and cases cited.

Two facets of the law are commonly encountered in situations such as we have here, (1) "the law applicable to the case, so far as it concerns the standard of conduct required of the parties, is the law of the place of injury," and (2) the *application* of that standard must be made according to the law of the District of Columbia, for that is a procedural matter. Consequently, the question whether there is sufficient evidence to take the case to the jury must be determined according to our law. Tobin v. Pennsylvania R. Co., 1938, 69 App. D.C. 262, 263, 100 F.2d 435, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040.

In Virginia, established through cases too numerous to mention, the standard of conduct owed to this plaintiff is that of ordinary care, dependent upon the circumstances of the particular case. It is such care as a person of ordinary prudence, under all the circumstances, would have exercised. Restatement, Law of Torts § 285. Granting the standard is that of ordinary care, has Virginia by statute or final appellate court decision established whether the *particular conduct* involved here is or is not negligent, considering all the circumstances? We have found no Virginia case, and none has been cited, where a person known to be untrustworthy, known to have no

driver's license, by inference incompetent to drive, is nevertheless entrusted with the keys to an automobile, told to start and run the engine, is then left without supervision or control, and thereupon purloins the car, drives away, and negligently injures a third person. Cf. Restatement, Torts § 302(b), comment n, and § 308.

■ In Howard v. Chesapeake & O. R. Co., 1897, 11 App.D.C. 300, 337, affirmed, 1898, 178 U.S. 153, 20 S.Ct. 880, 44 L.Ed. 1015, this court said: "There being no proof of the laws of Kentucky or Indiana as regards the property rights of married women, *the presumption must be indulged either that the rule of the common law or that in force in the District of Columbia prevails in both those States.* If it be the rule of the common law, clearly the wife could not release the claim for damages. If it be the rule prevailing in the District, we are constrained to adopt the same conclusion." (Emphasis supplied.) "In the absence of evidence, the common law of another common-law state is presumed to be the same as the common law of the forum." Restatement, Conflict of Laws § 622.[2] We will therefore apply the common law standard as it has been defined in this Circuit on the presumption that Virginia's common law is the same as our own. Restatement, Conflict of Laws § 380(2). Cf. Peterson v. Boston & M. R. R., 1941, 310 Mass. 45, 36 N.E.2d 701, 702.

## II

■ Closest in principle as to whether the particular conduct involved here is or is not negligent is Crowell v. Duncan, 1926, 145 Va. 489, 134 S.E. 576, 582, 50 A.L.R. 1425. There, the defendant father "knew, or had reasonable cause to know, that his son was in the habit of getting under the influence of intoxicants", and that he "drank intoxicants" and "had been arrested for transporting ardent spirits," and still permitted the son to drive the defendant's car at will. The opinion observes: "Incompetence, recklessness, and accident are so universally the sequel of drinking that an owner of an automobile is put on notice of what is likely to occur if he does not take active steps to prevent any one addicted to drinking from driving it. If he fails in the performance of this duty, he should suffer the consequences of his neglect." Repeatedly cited with approval in later cases, the Crowell doctrine was expressly affirmed in Hackley v. Robey, 1938, 170 Va. 55, 195 S.E. 689, 693–694, and is regarded as providing the foundation of "the test of liability under the doctrine of entrustment," viz. "whether the owner knew, or had reasonable cause to know, that he was entrusting his motor vehicle to an unfit driver likely to cause injury to others." McNeill v. Spindler, 1950, 191 Va. 685, 62 S.E.2d 13, 16. See also, Harrison v. Carroll, 4 Cir., 1943, 139 F.2d 427, 428.

Virginia by statute, § 46–384, Michie's Code of Virginia, 1950, has provided: "No person shall authorize or knowingly permit a motor vehicle owned by him or under his control to be driven by any person who has no legal right to do so or in violation of any of the provisions of this chapter." By other Code sections, an operator's license is required, and penalties are provided for various violations. The chapter "was designed under the police power of the state to protect the use of the highways from those who are not qualified to operate motor vehicles . . . and generally to regulate . . . the granting or with-

**2.** So, in Mountain Lake Land Co. v. Blair, 1909, 109 Va. 147, 63 S.E. 751, 752, the court said: "The courts of this state will not take judicial cognizance of the laws of our sister states at variance with the common law, but upon common-law questions the legal presumption is that the common law of a sister state is similar to that of our own. (Citing cases.) This case must therefore be decided according to the principles of the common law." See also Norfolk & W. R. Co. v. Denny's Adm'r, 1907, 106 Va. 383, 56 S.E. 321, 327, citing Minor, Conflict of Laws 528, 529, 530 (1901); Wigmore, Evidence § 2536 (3d ed. 1940). Both the District of Columbia and Virginia apply the common law.

holding of this privilege in furtherance of the safety of the users of the highways of the state." Hannabass v. Ryan, 1935, 164 Va. 519, 180 S.E. 416, 417. The privilege of receiving an operator's license is granted to those who are qualified and is withheld from those who are not. Law v. Commonwealth, 1938, 171 Va. 449, 199 S.E. 516, 519. It is clear that Virginia conceives of these statutes as safety measures, just as the purpose of revocation authority is to protect the public and remove from the streets a driver who is likely to cause injury and damage before a tragedy occurs. Prichard v. Battle, 1942, 178 Va. 455, 17 S.E.2d 393, 396.[3] In no reported case can we find that Virginia's highest court has dealt with the precise point presented here. Cf. Restatement, Law of Torts § 302(b), comment n, and § 308. We will, accordingly, examine our own decisions presenting instances of particular conduct, within or without the standard of negligence, according to special circumstances.

### III

We have held liable to an injured plaintiff, a truck owner whose driver left the truck in an alley with the ignition unlocked and the key in the switch in violation of a traffic regulation where, thereafter, an unknown person took and so negligently drove the truck as to injure the plaintiff. Ross v. Hartman, 1943, 78 U.S.App.D.C. 217, 139 F.2d 14, 158 A.L.R. 1370, certiorari denied, 1944, 321 U.S. 790, 64 S.Ct. 790, 88 L.Ed. 1080.[4] Holding that the violation of the traffic regulation was negligence, we pointed out that "The rule we are adopting tends to make the streets safer by discouraging the hazardous conduct which the ordinance forbids. It puts the burden of the risk, as far as may be, upon those who create it." Id., 78 U.S.App.D.C. at page 219, 139 F.2d at page 16. Again, in

Schaff v. R. W. Claxton, Inc., 1944, 79 U.S.App.D.C. 207, 144 F.2d 532 and see R. W. Claxton, Inc., v. Schaff, 1948, 83 U.S.App.D.C. 271, 169 F.2d 303, certiorari denied, 1948, 335 U.S. 871, 69 S.Ct. 168, 93 L.Ed. 415, though the unlocked car was left in a private parking place open to the public, in close proximity to the street and next to a restaurant where restaurant employees took it, we ruled it was for the jury to decide whether or not "the defendant's driver was negligent in leaving the car unlocked and that this negligence was a proximate cause of the accident." [79 U.S.App.D.C. 207, 144 F.2d 533.] We have permitted the owner of a car to recover from a garage owner where a garage employee took a stored car without permission and negligently drove and overturned it. Medes v. Hornbach, 1925, 56 App.D.C. 13, 6 F.2d 711, 712. There a motion for directed verdict was granted at the close of plaintiff's case. Reversing judgment for the defendant we said: "It is the duty in general of one operating a garage in which automobiles are kept in storage for pay to exercise ordinary care *by the employment of trustworthy servants and otherwise* for the safekeeping of the cars in his charge. On the other hand, he is not an insurer of their safety, and if a stored car is stolen from the garage *without negligence upon his part,* he is not in general liable to the owner for the loss. This rule likewise applies, should the thief be an employee of the person operating the garage, if the theft occurs without the connivance or *negligence* of the employer. Nevertheless, when the proof establishes that a stored car, while in the charge of the garage keeper, has been taken out and used by an employee of the latter, without the knowledge or consent of the owner, and has been damaged by such use, such proof, standing

---

3. An operator's permit may be issued in the District of Columbia only when the applicant, after examination, is found to be "mentally, morally, and physically qualified to operate a motor vehicle in

such manner as not to jeopardize the safety of individuals or property. . . ." D.C.Code, § 40-301 (1951).

4. See comments, 92 U. of Penn.L.R. 467; 32 Georgetown L.J. 202.

alone and unexplained, is sufficient to make out a prima facie case for a recovery by the plaintiff." (Emphasis supplied.)

Where an untrustworthy garage employee, Clinton, purloined a car from the garage, controlled it overnight, and next day permitted one of his friends to borrow it, the operation by the latter, Cherry, was held to break the chain of causation between the garage owner's negligence and the injury. The fact that Cherry had a criminal record was immaterial, for he did not steal the car, nor did he know Clinton had stolen it. Howard v. Swagart, 1947, 82 U.S.App.D.C. 147, 161 F.2d 651. To permit recovery, we said, would result in a "strained construction of the legal concepts pertaining to negligence and proximate cause. . . . The effect of our decisions in the Ross and Schaff cases was that a wilful, malicious and criminal act of an intermeddler was not an 'efficient intervening cause' in the circumstances there presented where the action was between the injured party and the owner of the car, and where the owner was held responsible. . . . It cannot fairly be said that this court meant, by the Ross and Schaff decisions, to impose liability on the owner, or here the bailee, of an unlocked car for the negligent action of every person, *other than the thief*, driving it subsequent to the theft." Id., 82 U.S.App.D.C. at page 151, 161 F.2d at page 655. (Emphasis supplied.) We declined to say that hiring the parking attendant, Cherry, "without an independent investigation as to his reliability constitutes negligent action in view of the fact that he was taken upon the recommendation of the United States Employment Service." We thus did not decide whether the rule in Medes v. Hornbach, supra, recognizing the duty of the garage owner to exercise ordinary care in the employment of trustworthy servants should be extended.

Recently we denied recovery for failure to establish a proximately causal relationship between plaintiff's injury and defendant's alleged negligence in Casey v. Corson & Gruman Co., 1955, —— U.S. App.D.C. ——, 221 F.2d 51. There an unlocked sand and gravel truck was stolen during the night from a construction company's private parking lot. The unknown thief struck the plaintiff's truck near Petersburg, Virginia, but there was no element of entrustment and no knowledge on the part of the owner that the vehicle was to be operated in any manner by the thief and no reason to foresee it might be driven to Virginia. We pointed out that leaving the truck unlocked on defendant's lot "was too remote from the collision in time, place *and circumstances*." (Emphasis supplied.)

██ It is clear under our common law, in applying the standard of ordinary care, that particular conduct, depending upon circumstances, can raise an issue for the jury to decide in terms of negligence and proximate cause, and in accordance with the rule previously discussed, we presume that such is the law in Virginia.

### IV

██ This court has said "The law holds responsible in damages one whose negligent act is the proximate cause of injury to another. 'The proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred.'" S. S. Kresge Co. v. Kenney, 1936, 66 App.D.C. 274, 275, 86 F.2d 651, 652; Howard v. Swagart, supra, 82 U.S. App.D.C. at page 151, 161 F.2d 651; Ross v. Hartman, supra. And such is the law in Virginia. Scott v. Simms, 1949, 188 Va. 808, 51 S.E.2d 250, 253, where the court makes clear that in "each case the problem is to be solved upon mixed considerations of logic, common sense, justice, policy and precedent." Except for extremes cited, "The cases that fall between those two classes are within the province of the jury." Again at page 254 of 51 S.E.2d the court teaches "In order for the defendant's negli-

gence to be a proximate cause of the injury, it is not necessary that the defendant should have foreseen the precise injury that happened. It is sufficient if an ordinary, careful and prudent person ought, under the circumstances, to have foreseen that an injury might probably result from the negligent act."

Such principles are well established by many Virginia precedents, and unless the fair inferences are so free from doubt as to permit the court as a matter of law to conclude that there was no causal connection between the negligence and the injury, the issue is one for the jury. Such is this case. If the jury concludes that the defendant was negligent in permitting Coates to have access to the car under the circumstances heretofore presented, it may next inquire whether or not the consequences might reasonably have been anticipated. If so, the defendant is liable, even though the precise injury need not have been foreseen. Norfolk & W. R. Co. v. Whitehurst, 1919, 125 Va. 260, 99 S.E. 568; Scott v. Simms, supra, and cases cited and considered.

## V

When announcing what he aptly called a "difficult decision in this case," the trial judge said: "The Court believes on the basis of presentation made by counsel on both sides in this case, that the Court is required to grant the defendants' motion for a directed verdict as to both defendants." He sent for the jury, and upon its return, explained that he had "heard argument of several hours, as you bear witness . . .." The record does not inform us as to the "presentation" made by the defense but the trial judge's remarks indicate he had been informed that Coates was "never sent on errands or otherwise permitted to use the car . . . he had not been convicted of dangerous driving." Defendants' brief urges upon us that the injury occurred "after the theft had been reported to the Police" and that during the period of Coates' employment "there has been no trouble or difficulty with his conduct or employment." Such items of facts, so relevant in a trial, were not part of the opening statement and are mentioned only to demonstrate that the "presentation made by counsel on both sides" revealed possible doubt as to the facts or permitted conflicting inferences. That was enough to bring the case squarely within the ambit of the opinion by Mr. Chief Justice Hughes writing for a unanimous court in Best v. District of Columbia, 1934, 291 U.S. 411, 415–416, 54 S.Ct. 487, 489, 78 L.Ed. 882, from which we quote:

"There is no question as to the power of the trial court to direct a verdict for the defendant upon the opening statement of plaintiff's counsel where that statement establishes that the plaintiff has no right to recover. The power of the court to act upon facts conceded by counsel is as plain as its power to act upon evidence produced. Oscanyan v. Arms Co., 103 U.S. 261, 263, 26 L.Ed. 539. The exercise of this power in a proper case is not only not objectionable, but is convenient in saving time and expense by shortening trials. Liverpool, N. Y. & P. S. S. Co. v. Commissioners [of Emigration], 113 U.S. 33, 37, 5 S.Ct. 352, 28 L.Ed. 899. *But the power is not properly exercised if the opening statement leaves doubt as to the facts or permits conflicting inferences. Where uncertainty arises either from a conflict of testimony or because the facts being undisputed, fair-minded men may honestly draw different conclusions from them, the question is not one of law, but of fact to be settled by the jury.* Richmond & Danville R. Co. v. Powers, 149 U.S. 43, 45, 13 S.Ct. 748, 37 L. Ed. 642; Texas & Pacific R. Co. v. Harvey, 228 U.S. 319, 324, 33 S.Ct. 518, 57 L.Ed. 852; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720. The opening statement of counsel is ordinarily intended to do no more than to inform the jury in a general way of the nature of the

action and defense so that they may better be prepared to understand the evidence. 'If a doubt exists,' said the Court in the Oscanyan Case, supra, 'as to the statement of counsel, the court will withhold its directions, as where the evidence is conflicting, and leave the matter to the determination of the jury.' *Plaintiff is entitled to the benefit of all inferences that may be drawn from his counsel's statement.* To warrant the court in directing a verdict for defendant upon that statement, it is not enough that the statement be lacking in definiteness, but it must clearly appear, *after resolving all doubts in plaintiff's favor,* that no cause of action exists. See Illinois Power & Light Corp. v. Hurley, 8 Cir., 49 F.2d 681, 684; Stuthman v. United States, 8 Cir., 67 F.2d 521, 523." (Emphasis supplied.)

Clearly, we must grant plaintiff the benefit of the principles to be deduced from the foregoing exposition as we consider the substantive issues of negligence and proximate cause. Moreover, as a procedural matter, this aspect of the case comes squarely within Tobin v. Pennsylvania R. Co., supra, 69 App.D.C. at page 263, 100 F.2d 435, and Shewmaker v. Capital Transit Co., 1944, 79 U.S.App. D.C. 102, 103, 143 F.2d 142.

## VI

We do not and will not say that an employer at his peril hires one known to have been a thief. We would wish to see paroled former convicts rehabilitated and receive encouragement in their efforts to achieve that status. Here, however, the plaintiff offered to prove not merely that J. Spencer Love and his manager Hamilton knew that Coates had twice been convicted of stealing and that he had served almost half his life in penal institutions. The gravamen of the offer was that Coates was untrustworthy and *was known by Love and Hamilton to be so.* They knew he had no driver's license, from which it might be inferred that he was incompetent, unqualified for

and unable to get one. It might be inferred that his employer knew and deemed him to be incompetent, for even when the family was at home, he was trusted to drive only on the premises, to the front door. Maids were under instructions to give car keys only to Hamilton, from which it might be inferred Coates was to perform duties with respect to the cars only under Hamilton's supervision. When the family was away, it might be inferred, Coates was not to be trusted to do more than warm up the engine and then under Hamilton's control. Yet Hamilton made the keys available to an untrustworthy, incompetent gardener, abandoned all supervision and control and went away for the day. Even when the injury occurred Coates was trying to reach the premises before Hamilton could return to the house and detect the dereliction. Is it untoward to infer Coates might have done that very thing on previous occasions unknown to Hamilton? In any event, is it not possible, without our so deciding, that the conduct of the owner or Hamilton in doing what was done, as well as in failing to do what he could have done was negligent? "and not the less so, because the imprudent and unauthorized act of another may be necessary to realize the mischief to which the unlawful act or negligence of the defendant has given occasion."? See the discussion by Mr. Justice Harlan in Union Pacific Railway Co. v. McDonald, 1894, 152 U.S. 262, 14 S.Ct. 619, 38 L.Ed. 434, and principles evolved and analyzed in cases from which he quotes, including the foregoing excerpt from 152 U.S. at page 279, 14 S.Ct. at page 625. If duty "must find its source in special circumstances", Best v. District of Columbia, supra, 291 U.S. at page 419, 54 S.Ct. at page 491; Schaff v. R. W. Claxton, Inc., supra; Medes v. Hornbach, supra, a jury may decide that plaintiff's opening statement disclosed them. And see Restatement, Torts § 308 comment b, illustrating that the rule "applies where the actor entrusts a thing to a third person . . . if the third person's known character or the peculiar circum-

stances of the case are such as to give the actor a good reason to believe that the third person may misuse it." It was for the jury to decide whether or not the defendant J. Spencer Love breached that duty to the plaintiff and whether or not the consequences might reasonably have been anticipated. Gunning v. Cooley, 1930, 281 U.S. 90, 50 S.Ct. 231.

Since the same "special circumstances" did not obtain as to Robert Lee Love, away in military service, and since plaintiff did not offer to show that he did other than leave his car on his father's premises in charge of the latter's secretary, "the power of the court to act upon facts conceded by counsel is as plain as its power to act upon evidence produced." Best v. District of Columbia, supra, 291 U.S. at page 415, 54 S.Ct. at page 489. As to him, the verdict was properly directed, and there is no error.

As to J. Spencer Love, a new trial is ordered.

Reversed as to J. Spencer Love.

Affirmed as to Robert Lee Love.

BASTIAN, Circuit Judge (dissenting).

I am unable to agree with the decision of the majority (except in so far as the ruling as to Robert Lee Love is concerned), as it seems to me that the trial judge was clearly correct in directing a verdict for both defendants on the opening statement of counsel for the plaintiff.

Plaintiff was injured under circumstances which, if proved, certainly constitute negligence on the part of the thief who was the driver of the automobile at the time of the accident. On this point I have no doubt. The action of the trial court was based not on the question of the negligence of the driver of the car, but on the fact that not only was there lack of authority on the part of that driver to drive it, but also that he was not given "any permission, of course, to drive the car off of the premises", nor was he "driving the car on any business of Mr. J. Spencer Love's." (Opening statement.) The plain fact is that Coates stole the car from his employer's premises.

Because of what seems to me to be a grave departure from recognized principles, I have set forth in the margin every allegation seeking to place liability in so far as the defendants are concerned.[1] In this connection, while I agree

---

1. "May it please the court and you ladies and gentlemen of the jury. This is a case brought by Sheila Ilina Boland against Mr. J. Spencer Love and Mr. Robert Lee Love for compensation for injuries sustained by her in an automobile accident down in Virginia.

"The evidence will show that the car which was involved in the accident was owned by Robert Lee Love and kept on the premises of J. Spencer Love in the District here. The driver of the car was in the employ of Mr. J. Spencer Love but, however, at the time of the accident he was not driving the car on any business of Mr. J. Spencer Love's.

"I should briefly tell you the evidence which will show you how the accident happened. Then I will briefly outline the evidence showing how and the circumstances under which the driver of the car had possession of the car on that day."

\* \* \* \* \*

(Here follow facts as to the happening of the accident, which, if true, show negligence on the part of the driver of the Love car.)

\* \* \* \* \*

"Shortly after the accident the driver left the scene.

"Now, with reference to what happened in Washington, the evidence will show that Mr. J. Spencer Love at that time owned a place out here on 3200 Northwest Ellicott Avenue. He kept on that place several automobiles, and among them was this Pontiac automobile owned by Robert Lee Love, his son.

"Robert Lee Love had left the premises shortly before and entered the Army and left the automobile there in care of a man named Hamilton who was the private secretary and employee of Mr. J. Spencer Love.

"The evidence will show that these automobiles were left there in charge of and under the control of Mr. Hamilton.

that the direction of a verdict on an opening statement should be made when only one conclusion can be reached, Best v. District of Columbia, 291 U.S. 411, 54 S.Ct. 487, 78 L.Ed. 882, I feel that this was a case where such direction was peculiarly appropriate.[2] It should be noted in passing also that this was not an opening statement by an inexperienced lawyer, who might have overlooked an important point, but that of an able, experienced and careful lawyer of recognized ability.

I agree with my brethren that the substantive law of the State of Virginia is applicable in this case. See Kas v. Gilkerson, 91 U.S.App.D.C. 153, 199 F.2d 398; Casey v. Corson & Gruman Co., 95 U.S.App.D.C. ——, 221 F.2d 51. See also Restatement, Conflict of Laws, Secs. 377, 378. This being so, we have a situation which is to be decided by the law of a state which has no financial responsibility law (as does the District of Columbia), where the courts have expressly rejected the "family purpose doctrine," Hackley v. Robey, 170 Va. 55, 195 S.E. 689, 692, and have permitted recovery against the owner of an automobile under the doctrine of *respondeat superior* "only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of some neglect or wrong *at the time and in respect to the very transaction out of which the injury arose*." Nixon v. Rowland, 192 Va. 47, 63 S.E.2d 757, 761;

---

"The evidence will show further that a man named Anderson, I believe, was employed just ahead of Coates. Coates was employed as his assistant, as a gardner and yard man, that is by Mr. J. Spencer Love. Then, before this accident took place, Mr. Anderson left and left Coates there to perform the services that had been performed by Mr. Anderson. And the evidence will show that Coates' duties, among others, were to drive the automobiles around to the front door when the family was there, and when they were not there and the automobiles or any of them were left on the premises, he was supposed to start the automobiles up and run them idle, so to speak, so as to keep them alive or keep the batteries from dying, and perhaps wash the automobiles.

"The evidence will show that in the early part of January, 1951—now, mind you, this accident happened on January 23, 1951—in the early part of January, 1951, Mr. Love and his family locked the house up, left it, and went away for several months.

"He left Mr. Hamilton, the employee-secretary there, supposedly to supervise Coates, look after the automobiles and what not, but Mr. Hamilton worked in the office downtown and so in the morning he would leave and go to the office and leave Coates on the premises. So, on the morning of January 23, 1951, with Mr. Love and his family away, all of the other servants, maid and man servants away with the family, excepting Mr. Coates, Mr. Hamilton left the house that morning leaving no one there to super-

vise Coates in any way, shape or form, and Coates finding himself on the premises with no one to supervise him, took the automobile and drove it down into Virginia.

"Now, the evidence will show that in order that Mr. James Coates might perform his duties, the automobile keys were sometimes given to the maids when they were in the house, with the instructions to give them to Hamilton, and if none of them were there, the keys were placed over the Sunvisor [sic] or windshield.

"On this morning, the 21st of January, I believe, or 22nd, 1951, Mr. Hamilton placed these keys—*according to Coates*—over the windshield and told him where the keys were and to take the car and start it up and charge the batteries. But he did not give him any permission, of course, to drive the car off of the premises.

"So Coates, with no one there to supervise him or control him, took the automobile, went down into Virginia and, coming back, according to the evidence, was a little late and was hurrying to get back to Washington before Mr. Hamilton got back from work, and had this accident.

"Now, the evidence will further show that Coates, I believe back in his teens, was convicted of stealing and again convicted of stealing when he was about twenty-two. He was too young to serve or go to the penitentiary on the first conviction, but he was sent to some training school here and confined there for his infractions of the law, and then he was convicted about twenty-two and given 32 months, I believe, to five years in prison.

2. See note 2 on page 39.

Meek v. Graybeal, 195 Va. 381, 78 S.E.2d 593. (Emphasis supplied by Virginia court.)

Further, the law of Virginia is that an automobile is not a dangerous instrumentality[3] unless the owner "*intrusts* it to one, though not an agent or servant, who is so incompetent as to the handling of same as to convert it into a dangerous instrumentality, and the incompetency is known to the owner when permitting the use of the vehicle." (Emphasis supplied.) Crowell v. Duncan, 145 Va. 489, 134 S.E. 576, 582, 50 A.L.R. 1425.

Under these circumstances, plaintiff is forced to base her claim upon the doctrine of "intrustment". The law of Virginia is clear that if the owner of a car *intrusts* his automobile *to be driven* by a person known to be accustomed to drive under the influence of intoxicating liquors, or known as a reckless or incompetent driver, or by one who is an epileptic or the like, liability may be fastened on the owner if he knew these facts.

In Flanagan v. Kellam, 187 Va. 754, 48 S E.2d 69, where intrustment was relied upon by plaintiffs, the court distinguished the Crowell case, supra, pointing out that in Crowell the father gave the son, when it was not otherwise in use, the unlimited use of the taxicab, to be used by him at will, the son being addicted to the use of ardent spirits and this fact being well known to the father. In Flanagan the record disclosed that the mother did not on a single occasion allow the son to *drive* the automobile, permitting him to use it when she was assured that some one else would drive; and, it being shown that the mother never having given her son *permission to drive* the automobile after revocation of his operator's permit, there could be no recovery. In Flanagan, Weatherly was driving an automobile belonging to his mother. Weatherly's fiancee, Flanagan, was a passenger in the car and was injured as a result of Flanagan's negligence. The court struck out all evidence against the mother. The court said:

"Apparently, the theory of the plaintiffs' cases, as disclosed by their respective notices of motion, was that Weatherly was operating the automobile as an agent for his mother. In the final stages of the trial reference to the sympathy he expressed for the injured plaintiff and not to any doubts he may have had as to his decision. The statement was made to the jury in explanation of the reason why they were not required to hear the case. Further, I do not think that the trial judge indicated that he considered any matter presented during the argument other than those submitted in the opening statement. Nor have I gone beyond the words in that statement. The trial judge specifically stated in his ruling that "if the plaintiff proves everything she has said she is going to prove in her case, as a matter of law there still will be no case to go to the jury."

"Let's see if I can get the dates here now. On September the 13th, 1948, he was released from prison under supervision of the parole officer, was reporting to the parole officer. In the early part of '49, I believe it was, he was employed by Mr. Love, and he completed his parole, I believe, on January 14, 1951.

"Now, the evidence will show that Mr. J. Spencer Love and his servant and employee Mr. Hamilton, knew the record of James Coates; knew that he was untrustworthy, that he had been twice convicted of stealing and had served in prison almost half of his time after he got ten years old, and the evidence will show that they knew that he did not have a driver's license and that when they went away and left him without any supervision, it is our claim that they were negligent in thus entrusting these automobiles to this man, and it is that negligence upon which we base our claim."

2. The statement of the trial judge, appearing in the majority opinion, that he had "a difficult decision in this case" had

3. See Hackley v. Robey, supra, where the court said: "Some of the courts have taken the view that an automobile is such a dangerous agency, 5 Am.Jur., p. 522, § 11, although it was expressly rejected by this court in Cohen v. Meador [Cohen v. Meador, 119 Va. 429, 89 S.E. 876] and in Blair v. Broadwater [Blair v. Broadwater, 121 Va. 301, 93 S.E. 632, L.R.A. 1918A, 1011]."

this theory was abandoned and the sole basis for liability was then contended to be that Carrie Kellam was guilty of independent negligence by entrusting the automobile to her son who had previously had his operator's permit revoked because he had improperly operated a motorcycle."

The court said further:

"We think the court was correct in striking the evidence as to Carrie Kellam. The automobile was not being driven on any mission of hers; it was being driven at the time for the pleasure of Weatherly and his friends; therefore, the doctrine of respondeat superior does not apply."

Not a single case has been disclosed, either in Virginia or elsewhere, where, under facts similar to the instant case, liability has been fastened onto a defendant. With entire fairness, counsel for plaintiff admits that the employee was not given any permission to drive the car off the premises and that, at the time of the accident, he was not driving the car on defendants' business.[4]

In McNeill v. Spindler, 191 Va. 685, 62 S.E.2d 13, in discussing the doctrine of intrustment, the Virginia court cited with approval Williamson v. Eclipse Motor Lines, 145 Ohio St. 467, 62 N.E.2d 339, 342, 168 A.L.R. 1356, which case is even stronger than the instant case. There an alleged incompetent driver had been permitted to take and operate defendant's automobile. He deviated from his employment and drove the automobile for his own purposes. The court examined the question of the alleged negligent intrustment of the automobile to an allegedly inexperienced or incompetent person. The court said:

"We have seen that the liability involved does not arise out of the relationship of the parties, whether of family, business or otherwise, but results from the act of entrustment of a motor vehicle to an incompetent or inexperienced operator. Negligence of the owner is the basis of the liability."

The court also stated:

"The liability, therefore, does not arise out of the relationship of the parties, but out of the act of entrustment of the motor vehicle, with permission to *operate* the same, to one whose incompetency, inexperience or recklessness is known or should have been known by the owner. (Citing cases.) *Mere delivery of a motor vehicle to another without permission to operate it does not give rise to liability of the owner for the wrongful and negligent operation of such motor vehicle.*" (Emphasis supplied.)

I do not believe the doctrine of intrustment is applicable to this case. There was no "intrustment". The car was driven off the premises of the defendants by a thief.

Let us look at the direction toward which the decision of the majority leads us. Suppose a person has been imprisoned for assault. Upon his release he obtains a position in a restaurant as a dishwasher or as a kitchen assistant of some sort. Among the articles he washes or uses is a sharp knife or cleaver. One day he steals such knife or cleaver, uses it in connection with a hold-up, and kills some one. Under the theory of the majority he has been "intrusted" with the implement. Does this make the restaurant owner liable in damages?

Or suppose a parolee is employed in a machine shop, where he uses a chisel or screwdriver. One night he goes out, uses the chisel or screwdriver to break into a store; he robs the store and kills a watchman. Under the theory of the ma-

---

4. Note that in Crowell, supra, relied on by the plaintiff, permission was given to use the car for driving at will and without restriction. In the Crowell case, in McNeill v. Spindler, infra, and in Harrison v. Carroll, 4 Cir., 139 F.2d 427, cited by the plaintiff, the owner permitted the *driving* of the car.

jority he has been "intrusted" with the implement. Does this make the machine shop owner liable in damages?

These examples, of course, can be multiplied; and there is just as much reason for holding the restaurant owner or the machine shop owner in the above examples liable in damages as there is for holding either of the defendants liable in this case.

In passing, although forming no basis for my opinion, it may be noted that the action of this court makes it even harder than it is today for a parolee to rehabilitate himself. No one could hire such a person except at his peril, if the law is as the majority says it is to be. Certainly, if one hires such a person, he had better install a safe in which to keep the keys of his car, for he may not leave them around unguarded.

This is a hard case. A young girl has been seriously injured. But it has been said "hard cases make bad law" and, in my opinion, that is the case here.

I take this opportunity of saying that my experience as a trial lawyer and a trial judge convinces me that something should be done to protect innocent victims of persons who are financially irresponsible, as was apparently the case of the thief in this case. But it is up to the legislative bodies to provide remedies, whether by way of an unsatisfied judgment statute or otherwise.[5] It is not for the courts to legislate or extend liability where none by law has ever existed.

In conclusion, the majority rules out of this case the doctrine of intervening independent negligence, which has been recognized by the Virginia courts.

I would affirm as to both defendants.

---

5. The financial responsibility laws do not give adequate protection. An owner of a car may properly park a car, lock the ignition and windows; the windows may be forced, the engine started by crossing the wires, and the car driven away by a thief, who ultimately may injure a person and then escape. The injured person is without recourse. Consequently, some remedy such as is provided, to some extent at least, by the Canadian unsatisfied judgment fund, or the Manitoba plan in particular, should be considered. Similar plans have been adopted in North Dakota and New Jersey, in Alberta, Nova Scotia and Newfoundland. I suggest that some such plan is deserving of the consideration of the Congress.